Filed 9/23/24  P. v. Howell CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B321226 |
| Plaintiff and Respondent, | Los Angeles County |
| v. | Super. Ct. No. TA152960 |
| MICHAEL HOWELL, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Hector E. Gutierrez, Judge.  Affirmed.

Richard D. Miggins, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Scott A. Taryle and Blythe J. Leszkay, Deputy Attorneys General, for Plaintiff and Respondent.

————————————

A jury convicted Michael Howell of one count of pandering. Howell mainly claims that insufficient evidence supports this conviction. He secondarily argues prosecutorial misconduct and ineffective assistance of counsel tainted his trial and the trial court erred by denying discovery and questioning related to the Racial Justice Act (Stats. 2020, ch. 317, § 1) (the Act), codified in part at Penal Code section 745. We affirm. Undesignated code citations are to the Penal Code.

The offense of conviction, which is pandering under section 266i, subdivision (a)(2), uses the noun "prostitute." We do as well.

I

We summarize facts favorably to the verdict. (See *People v. Campbell* (2020) 51 Cal.App.5th 463, 469 (*Campbell*).)

On October 22, 2020, Deputy Vanessa Dingillo posed as a prostitute near a street corner in Compton known as a gathering place for prostitutes. She was part of an undercover operation with the Los Angeles County Sheriff's Department's human trafficking team. They were out to get "johns"—purchasers of commercial sex—and "pimps"—people who earn a living off sex workers. Dingillo had been trained about human trafficking and mentored by human trafficking task force members. She had participated in other undercover operations posing as a sex worker and had spoken with all types of participants in the commercial sex industry.

Dingillo paced along the street. She wore a short black romper, a blue wig, and blue sunglasses. Dingillo also wore a microphone and transmitter that allowed her team to hear her in real time. She was interested in whomever drove up to her that day; there were no particular targets.

A Mustang stopped at the corner 10 to 15 feet from her. Dingillo saw a driver and a passenger. She told her team, "Might be a pimp."

Howell was driving. He rolled down his window and said something Dingillo could not hear. He directed her to the driver's side of the car and said, "Come here." Dingillo approached the car. Howell asked her name. The rest of their recorded conversation appears below, with ellipses in place of unintelligible statements:

"[Howell]: What's up mommy? You ready? You ready to come home?

"Dingillo: You from out here?

"[Howell]: Yup. . . .

"Dingillo: Huh?

. . .

"[Howell]: Ready? . . . What you got on you? A couple hunnid?

"Dingillo: Maybe.

"[Howell]: . . . I'll take care of you. Get in the car.

"Dingillo: I'm not about to get in with you.

"[Howell]: Why?

"Dingillo: 'Cause I don't know what you about.

"[Howell]: You know what I'm about. I'm on that game shit you . . . I'm good. I'm gonna shoot my shot. . . . Shit. We could figure it out though.

"Dingillo: What's that choose up?

"[Howell]: Huh?

"Dingillo: What's that choose up?

"[Howell]: Give me a rack.

"Dingillo: A rack?

"[Howell]:  Yup.

"Dingillo:  You be having your girls on the blade or on the internet?

"[Howell]:  I don't really be fuckin' with the blade, I fuck with the internet more.  I need you.  I'm not gonna lie to you.

"Dingillo:  How much you gonna make me charge?

"[Howell]:  Huh?

"Dingillo:  How much you gonna make me charge?

"[Howell]:  You?

"Dingillo:  Yeah.

"[Howell]:  You better be two hundred, three, . . . one fifty, you know . . . like three hundred or higher, two fifty, you know. . . .

"Dingillo:  You let your girls do bareback or not?

"[Howell]:  Hell nah, you gonna do no fucking bareback.  Fucking bareback?  You gonna fucking die out here.

"Dingillo:  It's more money though.

"[Howell]:  More money . . . shit.

"Dingillo:  'aight.

"[Howell]:  Yeah.  Condoms only for real, that shit . . .

"Dingillo:  Yeah.

"[Howell]:  You die like that . . .  You got it.  You know yous you got it.  You some snow out here.  You know that –

"Dingillo:  *giggles*

"[Howell]:  . . . You feel me?

"Dingillo:  So you don't have girls right now?

"[Howell]:  No I –

"Dingillo:  So I'm not gonna have issues with no bottom bitch?

4

"[Howell]:  You got me until the next.  Right now . . .

"Dingillo:  Alright well, let me meet get in over there –

"[Howell]:  Alright.  Go right there.

"Dingillo:  – 'cause there's police and shit.

"[Howell]:  Alright go there.

"Dingillo:  Alright, Imma walk down the alley."

Detectives detained Howell in the alley.  They took the phone that was in his lap, which Howell admits was his.  Then they took Howell to the command post of the operation.

At trial, Dingillo and Detective Sinuhe Villegas explained some of the words in the recorded conversation.  Villegas was part of the human trafficking task force and had been a deputy sheriff for 22 years.  He was an instructor on human trafficking and had worked on more than 100 undercover operations.

Villegas explained the commercial sex industry is a subculture with its own rules and language.

According to Villegas and Dingillo, pimps or others use the term "come home" when they want a prostitute to come work for them.  Commercial sex buyers (johns) don't use this term.  Johns "usually just right off the bat ask 'How much?' "  "The game" refers to the relationship between a pimp and a prostitute.  "Choose-up" is the fee a prostitute would have to pay her pimp to "pimp her out."  Prostitutes pay this fee because they believe a pimp will make them more money.  Howell notably responded to the question about a choose-up with a dollar amount.  A "rack" is one thousand dollars.  A "blade" is a street or area where prostitutes walk or stand to conduct their business.  Prostitutes get work on the street or on the internet, so it was common for them to ask a pimp where they would work.  Howell's response to Dingillo's "blade" question showed he knew about this.

5

Dingillo testified that when she asked Howell about charging money, she was referring to sex acts. The amounts Howell quoted were in line with what typically was charged. Going "bareback" means having sex without a condom. Pimps often like their prostitutes to do this because they could charge more money. "Snow" and "snow bunny" describe a female white prostitute. "[A]ny pimp that has white females can potentially make more money because there are specific customers or johns that will look for white prostitutes." A "bottom bitch" is a pimp's most trusted prostitute who requires little instruction and often oversees the other prostitutes working for that pimp. Dingillo's question about this made sense, because sometimes the other prostitutes got into fights with a pimp's bottom bitch.

Dingillo explained her initial observation that Howell "[m]ight be a pimp." She said this because of the way Howell made eye contact with her and stopped at the corner, and based on her other encounters and her training. On cross-examination, Dingillo said less than half of the pimps she had interacted with were African-American. Howell's brief identifies him and his passenger as Black men.

Dingillo confirmed the "entire conversation, from the first thing he says to [me] all the way until [I] direct him to the alley, the language that he used" was consistent with a pimp.

Villegas testified about evidence they found on Howell's phone, including private social media messages. One message to Howell called him "Daddy" and used terms commonly used in the pimp-prostitute relationship. Another thread suggested Howell had a prostitute, was told to hold on to her, and was asked to have this prostitute find another one. "It is common for pimps to

6

have prostitutes recruit other prostitutes to either work for the same pimp or for other pimps."

Villegas testified about various images and videos that had been downloaded onto Howell's phone, some of which pictured scantily clad women flashing money. One video had "book now" on a shot emphasizing a woman's backside. A video featured Howell counting money.

Villegas concluded the totality of the recorded conversation showed Howell was recruiting Dingillo to be his sex worker. The content of Howell's phone supported this conclusion: the items were consistent with the things he saw in human trafficking and pandering investigations.

Villegas made various concessions. For example, he conceded key terms he had explained to the jury were used outside of the commercial sex context. He did not know whether any of the women appearing on Howell's phone were involved in the commercial sex trade.

Other prosecution witnesses testified about Howell's arrest, his phone, and extracting the data off it.

Howell testified, among other things, that he was not trying to act like a pimp or pick up a prostitute that day. Dingillo seemed like a cute girl he wanted to talk to, not a prostitute. As for parts of the recorded conversation, Howell explained he was "just talking" and he "just threw something out there." He denied using key terms the way Villegas and Dingillo explained them. Howell said one term ("choose-up") had a different meaning among Black people. The pictures the jury saw were from Instagram. He had photos and videos on his phone because he likes girls, particularly girls who dance.

The defense rested after Howell testified.

While deliberating, the jury had several questions for the court and counsel and voiced it was "not coming to a conclusion." The court reporter read back some testimony, the court reread various jury instructions, and counsel resumed argument on certain points.

The jury convicted Howell of one count of pandering in violation of section 266i, subdivision (a)(2). Howell moved for a new trial, arguing the court's denial of discovery under the Act and its limitations on his cross-examination infringed his rights, as we shall discuss. The court denied the motion and sentenced Howell to the mid term of four years in prison.

## II

We affirm because substantial evidence supports the jury's verdict. Howell's argument regarding the Act fails because he did not establish good cause for the far-reaching discovery his tardy motion sought.

## A

Howell first claims insufficient evidence supports his pandering conviction.

In reviewing such a claim, we examine the record in the light favorable to the prosecution and discern whether substantial evidence allowed the jury to find the crime's essential elements beyond a reasonable doubt. We presume the existence of facts the jury reasonably could deduce from the evidence. (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.) We accept logical inferences the jury might have drawn from the evidence, even if we would have concluded otherwise. (*Campbell, supra,* 51 Cal.App.5th at p. 484.) We reverse only if it appears there is insufficient evidence to support the verdict under any hypothesis. (*Zamudio*, at p. 357.) This is an enormous burden for a

defendant to overcome on appeal.  (*People v. Vasco* (2005) 131 Cal.App.4th 137, 161.)

Pandering covers a broad range of conduct and includes the business of recruiting a prostitute.  (*Campbell*, *supra*, 51 Cal.App.5th at p. 484.)  Under the subdivision at issue here, the pandering statute requires the prosecution to establish the defendant (1) used promises, threats, violence, or any device or scheme to cause, induce, persuade, or *encourage* another to be a prostitute, and (2) intended to influence the target to be a prostitute.  (§ 266i, subd. (a)(2), italics added; CALCRIM No. 1151; *People v. Zambia* (2011) 51 Cal.4th 965, 980 (*Zambia*).)  It makes no difference if the target is an existing prostitute or an undercover officer.  (*Zambia*, at pp. 973, 977 & 981.)

The People prosecuted Howell for one count of pandering by encouraging Dingillo to work as a prostitute.

As will become relevant, *pimping* under section 266h is a felony that differs from the felony of *pandering* defined by section 266i.  Pimping involves proof a defendant *derived support* from a prostitute's earnings, while pandering occurs when a defendant *induces* another person to become or to remain a prostitute. (Compare §§ 266i, subd. (a)(2) with 266h, subd. (a).)

Ample evidence satisfied the elements of pandering. Howell drove up to a woman standing on a street corner known for prostitution, and at the outset asked her to "come home." Howell concedes Dingillo was "dressed as a prostitute" and was "acting like a hooker."  He discussed the money he would require her to charge customers and the fee he would collect from her. He discussed using condoms, marketing via the internet, and other conditions of the arrangement he was proposing.  Howell promised he would take care of Dingillo, they could "figure it

9

out," and he had no other girls right now, so she had him "until the next."

We need not detail other incriminating evidence, including the contents of Howell's phone, for this evidence supports Howell's conviction for pandering by encouraging Dingillo to become a prostitute.

Howell concedes some of the terms he used with Dingillo were "sex-adjacent" but argues all of the words have benign meanings. Similarly, he focuses on the items found on his phone and argues for different inferences. These arguments are misdirected because we indulge reasonable presumptions available to the jurors. (*Zamudio*, *supra*, 43 Cal.4th at p. 357; cf. *People v. Sanghera* (2006) 139 Cal.App.4th 1567, 1574 [defendants who fail to present all relevant evidence or fail to present it in the light most favorable to the prosecution cannot carry their burden on a sufficiency challenge].)

Howell spends many pages arguing the prosecution tried but failed to show he was a pimp, and his *pandering* conviction makes sense only if he were a *pimp*. He claims rappers have elevated the "pimp life" as something to celebrate, particularly in the Black community, but talking like a pimp and having photos a pimp might have did not make Howell one.

This misdirected argument rests on the incorrect premise that the prosecution's failure to prove he was a pimp is a defense to the charge of pandering. Howell cites no authority for this illogical proposition. The proof of pandering was abundant. It does not matter whether the prosecution proved Howell ran a commercial sex website, posted images of genuine prostitutes, or used images in a nefarious way.

10

The jury reasonably could infer Howell believed Dingillo was a prostitute and was encouraging her to work as a prostitute for him. The evidence supports a finding Howell had the necessary intent. The pandering statute does not require that defendants like Howell mention intercourse or specific sex acts. Howell's substantial evidence challenge fails.

## B

Howell next claims the trial court erred and infringed his constitutional rights, first, by denying him discovery under the Act, and, second, by preventing questioning at trial regarding other arrests from the undercover operation. His ultimate point is that the court prevented him from establishing a racially motivated operation and prosecution. We take his two arguments in turn.

## 1

Effective January 1, 2021, the Act aims to eliminate racial bias from our criminal justice system and to ensure race plays no part in convictions and sentencing. (See *People v. Wilson* (2024) 16 Cal.5th 874, 944–946 (*Wilson*).) The Act commands that "[t]he state shall not seek or obtain a criminal conviction or seek, obtain, or impose a sentence on the basis of race, ethnicity, or national origin." (§ 745, subd. (a).) Subdivision (a) of the statute lists categories of conduct that amount to violations of the Act, if proved by the defendant by a preponderance of the evidence.

The Act's discovery provision allows a defendant to file a motion and, upon a showing of "good cause," to obtain evidence from the prosecution relevant to a potential violation of the Act. (§ 745, subd. (d); *Wilson, supra,* at pp. 951–952.) Howell's motion did not establish good cause.

11

We apply the conventional standards of review:  our review of legal issues is independent, and our review of factual determinations and discovery orders is deferential.

2

The procedural background began with Howell's arrest in October 2020.  The prosecution filed an information charging Howell with pandering in December 2020.  The same month, Dingillo testified at the preliminary hearing about the undercover operation.  Eleven months later, in November 2021, the same attorney who defended Howell at the preliminary hearing filed a discovery motion under the Act.  The parties argued the motion in early January 2022 and began jury selection at the end of February 2022, after the court granted a defense continuance request.

Howell's motion sought information and documents relating to pandering arrests, charges, declinations, and "racial disparities in charging" in the county going back a decade.

The motion referred only to subdivision (a)(3) as a potential violation, and it did so repeatedly.

This subdivision provides:  "The defendant was *charged* or convicted of a more serious offense than defendants of other races . . . who have engaged in similar conduct and *are similarly situated*, and the evidence establishes that the prosecution more frequently sought or obtained convictions for more serious offenses against people who share the defendant's race, ethnicity, or national origin in the county where the convictions were sought or obtained."  (§ 745, subd. (a)(3), italics added.)

Howell's sole justification for discovery was data he claimed showed 82.6 – 87% of *arrests* for pandering *in the City of Los Angeles* over certain periods involved African Americans, yet

12

African Americans made up roughly 9% of the city's and the county's population.

The prosecution's opposition argued, among other things, there was no good cause for the discovery. The arrest statistics were irrelevant, as they pertained to the Los Angeles *Police Department* and the *city* of Los Angeles, whereas the Los Angeles County *Sheriff's Department* made the arrest here *outside* of the City of Los Angeles. Further, subdivision (a)(3) concerns charging decisions, not arrests or other actions by law enforcement.

At the hearing on Howell's motion, which was a week before the scheduled trial date, defense counsel clarified she was asserting only a potential violation of subdivision (a)(3) and was seeking discovery relating to this provision. Counsel explained: "we are focused on what the Defendant was charged or convicted of. . . . We are saying here is someone being charged with pimping and pandering versus mere loitering as a john for prostitution." Counsel argued pandering is a "far more serious charge" and attributed the difference in charging to ethnicity.

The court denied the motion, noting there was no showing of any bias exhibited towards Howell. The court concluded the data were irrelevant. The court explained that soliciting someone to work as a prostitute is not "a more serious charge than being a john. It is a totally different charge." The case was old and had a trial date, the court observed, and the defense had had over a year to conduct its investigation. The court sent the case to another department for trial.

About two months later, in late February 2022, after a continuance due to defense need, Howell's attorney raised the discovery motion again *orally* before the new court but offered no

13

further evidence or grounds.  Counsel stated she wanted narrowed discovery concerning the "sting" operation that led to Howell's arrest.  She filed no motion to this effect.  (See § 745, subd. (d) [defense may "file" a discovery motion].)  Counsel conceded "we are already in trial" but maintained the defense wanted the discovery for credibility and impeachment purposes and because it went to "the overall picture of that day as well."  The prosecutor said she did not have the information requested and did not know how long it would take to get it and to redact it.

The new court said this was the first it had heard of the issue; it appeared the motion already had been decided; and it was inclined to deny the defense request.  The court stated it would look at the file.

The court returned to the matter on the record after trial had started.  The court held the motion had been litigated and ruled upon, and separately held it would deny the motion because there was no good cause.  In response, defense counsel argued she had sought more time for the narrowed discovery.

Defense counsel maintained she had a "good-faith belief" the discovery went to the issue of potential bias and would yield fruit for impeachment and cross-examination.  The prosecutor again noted she did not have the requested information and did not know how long it would take to collect it; the jury had been impaneled and "[w]e're in trial now"; and the discovery request was late and irrelevant.  The court agreed with the prosecution and reaffirmed its denial of discovery.  The court explained it needed more than counsel's good faith belief:  "You're asking for information as to other arrestees or people that were investigated or cited.  I don't even know what the facts or circumstances of that are to even make me go to the next step of could that show

14

bias.  I don't have any information."  "[T]here has to be some evidence.  There has to be something -- good cause."  "I understand you have a good-faith belief.  I would need evidence -- sworn testimony, declarations, affidavits, something to that effect -- to make me get to even that point."

Howell's motion under the Act did not establish good cause for discovery, and the court did not abuse its discretion or violate Howell's rights in denying the motion.  (See *People v. Thomas* (2023) 14 Cal.5th 327, 368 ["Because there was no statutory error, defendant's constitutional claims likewise fail"]; *People v. Pearson* (2013) 56 Cal.4th 393, 425 fn. 5 (*Pearson*) [rejecting, on the merits, a claim the trial court erred on an issue before it necessarily means rejecting any new constitutional "gloss" raised on appeal].)

Howell made no showing or claim that any incident involved similar conduct by a similarly situated person.  His motion made no claim that anyone had or exhibited racial bias or animus towards him.  This motion lacked a case-specific basis.  It was, moreover, tardy:  it was on the eve of trial after much delay, and it demanded discovery the court rightly feared would take an indeterminate but probably significant interval to assemble.  Howell's discovery demands were broad, and broad discovery demands predictably can trigger "protracted" proceedings.  (See *Wilson, supra,* 16 Cal.5th at p. 961.)

Unlike the trial court in *Young v. Superior Court of Solano County* (2022) 79 Cal.App.5th 138, 144, the trial court's reasons for denying the motion were not "incorrect as a factual matter."  (*Ibid.*)

On appeal, Howell argues Dingillo's initial observation during the undercover operation that Howell "might be a pimp"

15

suggests a violation of subdivision (a)(1), which proscribes law enforcement and others involved in a case from exhibiting racial bias or animus toward a defendant. (§ 745, subd. (a)(1).) Howell's brief at times goes much further than this, painting Dingillo as a racist who thought Howell was a criminal simply because he was Black and had approached a "pretty white woman" in an area "frequented by hookers."

Howell did not present this theory to the trial court as a justification for his section 745 motion and has forfeited this argument.

To the contrary, at the hearing on the motion, Howell's defense counsel maintained she was not accusing Dingillo of racial bias or animus: she said Dingillo was "fairly young in her career" and agreed with the court that "if it was just looking at number one [subdivision (a)(1)], I would not have a basis for that . . . ."

Later, during and after trial, after two judges had denied Howell's motion, counsel reversed field and argued Dingillo's comment suggested bias or potential bias. The Act permits discovery through a written motion, not through cross-examination after a failed motion. (See § 745, subd. (d).)

Howell's opening brief makes a passing reference to subdivision (a)(2), which covers uses of racially discriminatory language and expressions of racial bias or animus "[d]uring the defendant's trial." (See § 745, subd. (a)(2).) Dingillo's comment on the street during the undercover operation does not implicate this provision.

To the extent Howell suggests Villegas's trial testimony implicates subdivision (a)(2), his brief misstates the testimony. Villegas testified he believed pandering was the appropriate

16

charge after listening to Howell's recorded conversation with Dingillo. Defense counsel probed Villegas about Howell's race, and Villegas responded he did not know Howell was Black until after officers detained Howell. Villegas also testified charging decisions have nothing to do with race.

Finally, to the extent Howell's oral requests for discovery can be viewed as requests for discovery outside of the Act, Howell did not establish the trial court abused its discretion in denying the discovery, which Howell sought on the eve of trial and during trial. (See § 1054.5, subd. (a), § 1054, subds. (a) & (e) [discovery in criminal cases is limited and should be timely].)

3

Howell also claims the trial court violated various of his constitutional rights at trial by limiting inquiries into arrests of other individuals made on the day of his arrest as part of the undercover operation that ensnared him. He views this line of inquiry as relevant to witness credibility and potential bias.

Under Evidence Code section 352, trial courts have discretion to exclude evidence that threatens to mislead the jury, confuse the issues, or consume too much time. This discretion extends to evidence concerning witness bias or impeachment. (See, e.g., *Pearson*, *supra*, 56 Cal.4th at pp. 454–456.) We typically review these rulings for abuse of discretion. (See *id.*)

Howell's inadequate presentation of this issue in his opening brief forfeits any argument that the trial court's numerous rulings were trial abuses. (See *United Grand Corp. v. Malibu Hillbillies, LLC* (2019) 36 Cal.App.5th 142, 146 & 156 (*Malibu Hillbillies*).)

Defense counsel attempted to explore the topic of other arrests in a hearing under Evidence Code section 402 to

17

determine which items from Howell's phone the prosecution could introduce.  Counsel also tried to pursue this inquiry with several witnesses at trial (including Howell), but after prosecution objections, the trial court limited this questioning.  The trial court engaged in multiple extended discussions with counsel about the matter, outside the jury's presence.  The objections and discussions spanned more than 50 transcript pages.

Howell's opening brief presents almost none of this.  It cites and discusses only the Evidence Code section 402 hearing, which is inapposite, as the trial court made clear the point of that hearing was to address evidence from Howell's phone and how the prosecution would use this evidence, and the court explicitly ruled that questioning regarding other arrests was "not relevant for purposes of this 402 hearing."

Howell's brief does not discuss the trial court's concerns that questions about other arrests would confuse and mislead the jury and unduly consume time.  It does not grapple with other reasons the trial court gave for cutting off the inquiry.  It fails to acknowledge the court often qualified its rulings as based on the state of the evidence at the time of the ruling.  Howell's brief does not mention that defense counsel initially only offered her "good-faith belief" the requested inquiry would produce relevant information.  Only when her client testified did counsel attempt to provide an offer of proof regarding Howell's observations of other men held at the command post—who, according to counsel, were not Black and were not handcuffed (unlike Howell) and merely received citations.  Counsel did not argue or show these other detained men were situated similarly to Howell.

18

Howell also does not acknowledge his trial counsel otherwise was able soundly to cross-examine prosecution witnesses.

These failures are critical given Howell's recognition that the constitutional rights he highlights are subject to limits. (E.g., *Delaware v. Van Arsdall* (1986) 475 U.S. 673, 679 ["It does not follow, of course, that the Confrontation Clause of the Sixth Amendment prevents a trial judge from imposing any limits on defense counsel's inquiry into the potential bias of a prosecution witness. On the contrary, trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant."].)

It was Howell's burden to demonstrate error through cogent argument supported by legal analysis and record citations. (See *Malibu Hillbillies*, *supra*, 36 Cal.App.5th at p. 146.) Howell's failure to address and cite the record, and to develop an argument based on the record, forfeits this issue. (See *id.* at p. 156 [appellate courts are not required to search the record for error, and a party who fails to support an argument with necessary record citations forfeits the argument]; see also *Jameson v. Desta* (2018) 5 Cal.5th 594, 609 [appellants bear the burden of demonstrating, "on the basis of the record presented to the appellate court, that the trial court committed an error that justifies reversal of the judgment"].)

C

Finally, Howell contends the prosecutor committed misconduct, misled the jury, and violated his constitutional rights

19

by misstating the elements of pandering in closing arguments and thereby reducing the prosecution's burden of proof. We consider the challenged statements and then explain why Howell's contentions fail.

After several days of deliberating and multiple questions, the jury asked the court to elaborate on "Reasonable Doubt" and "Pandering" in the jury instructions. The court reread certain instructions—including the instruction on pandering—and permitted the attorneys to present additional argument.

Howell complains of a small portion of the prosecution's second round of closing argument. When addressing the elements of pandering, the prosecutor said:

"So first, uses promises or any device or scheme. That basically means anything. Right?

"Did he promise something? Did he flatter? Did he flirt? Did he do anything during that conversation, during that interaction? Any device or a scheme? That's what that means. Okay. So basically he's got to do something."

After this, the prosecutor focused the jury on the evidence. She pointed to Howell's promises to show that "what he was doing, was trying to encourage her or persuade her to continue as a prostitute." She gave the jury examples from the evidence: "I'll take care of you" and "You can make this much money." Counsel later expanded on the topic: "[C]ould he have been flirting with her? Yes. Is that perhaps how he was trying to get her to come with him versus all other men who might approach her to work for them or to continue with them? Absolutely." Counsel reinforced the jury instructions and ended her argument by telling the jury to "Look at the actual elements."

20

Far from objecting to this now-disputed line of argument, defense counsel exploited it in her argument, telling the jury: "You've heard the charge again, this pandering charge. The scheme, device, and dudes, blah, blah, blah. We've got nothing here." "There's no scheme. There's no promise. There's no anything."

Howell forfeited the issue of prosecutorial error by failing to raise it at trial. (See *People v. Johnsen* (2021) 10 Cal.5th 1116, 1164–1165 (*Johnsen*) [timely and specific objection required to preserve these claims].) The record does not establish a timely objection and admonition would have been futile or insufficient. (*See id.*)

Howell alternatively claims his trial counsel provided ineffective assistance in not objecting. A defendant claiming ineffective assistance of counsel must show deficient performance by counsel that prejudiced the defense. (*Johnsen*, *supra*, 10 Cal.5th at p. 1165.) On direct appeal, we find deficient performance only if (1) the record shows counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) no satisfactory explanation could exist. (*Ibid.*) We defer to counsel's reasonable tactical decisions and presume counsel acted within the wide range of reasonable professional assistance. (*People v. Mai* (2013) 57 Cal.4th 986, 1009 (*Mai*).)

Not objecting to the challenged statements was rational. Howell focuses on a few words from the second round of closing argument, isolated from the rest of the prosecutor's remarks. Viewing the argument as a whole, it is not reasonable to conclude the jurors went back to deliberating believing they could convict

21

Howell based on just "anything" or "something," as Howell argues.

The trial court more than once correctly instructed jurors on the elements of pandering, and it gave them a copy of the instructions. It explained: "Words and phrases not specifically defined in these instructions are to be applied using their ordinary, everyday meanings." It told jurors counsel's statements are not evidence, their verdict must be based on the evidence and the law the court provided them, and they must follow the law as the court explained it, even if they believed the attorneys' comments were conflicting. We presume the jurors followed these instructions. (See *People v. Chhoun* (2021) 11 Cal.5th 1, 30.) Howell's opening brief acknowledges the jury instructions govern and juries are required to follow them.

In short, defense counsel reasonably may have determined that objecting here was pointless or unnecessary, and that the more effective tactic was to attempt, in jiu-jitsu fashion, to turn the force of the prosecution's own words against it. (Cf. *Mai, supra*, 57 Cal.4th at p. 1018 [whether objections should be made is within counsel's discretion and rarely implicates ineffective assistance of counsel].)

The prosecutor's comments did not render this trial fundamentally unfair or signal she was attempting to sway the jury through deceptive or reprehensible methods. (See *People v. Navarro* (2021) 12 Cal.5th 285, 332.)

Because Howell did not establish deficient performance by his trial counsel, we need not reach the issue of prejudice.

///

///

///

22

## DISPOSITION

We affirm the judgment.

WILEY, J.

We concur:

STRATTON, P. J.

GRIMES, J.